Good morning, ladies and gentlemen. Welcome to the Ninth Circuit. We are pleased to be with you this morning. We have a couple of matters that have either been submitted on the briefs or ordered removed from the calendar. Albo v. County of Tulare was ordered submitted on the briefs. Morales v. Kimball has been removed temporarily from the calendar. That leaves us with three matters to be argued today. We'll begin with Automotive Industries Pension Trust Fund v. South City Motors. Good morning, Your Honors. Joshua Cliff on behalf of the dealerships in this case. It's an honor to be here today. If I could, I'll reserve five minutes for rebuttal. So before jumping into the handful of issues on this appeal, I want to talk a little bit about the statute that we're talking about just to provide some context. ERISA is a very unusual statute. This particular section of ERISA dealing with withdrawal liability disputes is also quite unusual. Unlike almost anything, any other kind of case that probably can be heard by this Court, ERISA provides that withdrawal liability, often in the millions of dollars, can be assessed by the plan. With no judicial review, no arbitration review, an employer has to immediately start making those oftentimes very large payments and can only challenge the assessment at a later time through arbitration. That is what happened in this case. In excess of $3 million was assessed against my clients as a group, and they had to immediately make quarterly payments on that amount. They have continued to make those payments and will as long as this challenge continues. I provide that context because, again, this statute is quite unusual, and the way that the issues are adjudicated are unusual. So in this case, the statute specifically says that an employer that's been assessed withdrawal liability must first go to the plan and challenge the assessment, which my clients did. That challenge was denied by the plan, and that then allowed the dealerships to go and request arbitration through AAA, which, again, they did in a timely manner. So you don't disagree with that procedure, that it went to arbitration? No. I think that up to that point, it followed the statute. It followed the particular rules that were in place. The PBGC regulates this particular type of dispute. There are obviously the PBGC regulations, which require an arbitration, and there are specific rules, the AAA issues, that govern this kind of dispute. And as we're going to get to in a minute, those are the particular rules that deal with the due process problem. That's the first of several issues on appeal here. So with the case in arbitration, we agreed to an arbitrator from the AAA panel conduct a discovery in the due course. As we'll talk about a little bit later, the plan is claiming that somehow the employer was acting improperly in serving discovery, but I would maintain that at the outset of this case, there was no guiding case law on almost any of the live issues in the case. The free look issue that we're going to talk about in a minute, there's no case law directly on point. The settlement agreement issue that we'll talk about in a minute, there is the Safeway case out there, but as we pointed out in our briefs, that Safeway case is not directly on point because it dealt with different language in the settlement agreement. It dealt with even a different type of withdrawal, which is treated very differently under the statute. So without any guiding principles, we were forced into a situation where we had to make some decisions. And instead of just challenging the assessment, we also brought particular equitable claims in arbitration on behalf of the dealerships, claiming that on equitable grounds, withdrawal liability could not be asserted. Again, there was no case law going either way on that. We thought it made the most sense just to proceed efficiently through one forum, in this case arbitration, and have all those issues heard together. So when we served that discovery, the plan objected, after some meet and confer discussions, the issue that then did go to the arbitrator. The arbitrator ultimately ruled that those particular equitable claims were not subject to arbitration under the statute. So, you know, knowing that those were potentially viable claims, the only other forum we had at that point was to go and then file those claims in the district court. I confess I'm not really sure what the point of all of this background is. How does it speak to the issues that are teed up in this case? Well, to get into those, Your Honor, first of all, the arbitrator in first denying certain discovery to the parties and then denying an evidentiary hearing denied my client's due process. There are particular rules that have been published here by AAA. They're specific to these types of disputes. And Rule 24, or Section 24 of those rules, is quite explicit that a hearing has to be conducted. Well, let's really separate things out. I mean, I take it you don't mean due process in the usual sense or constitutional sense because summary judgment is pretty well established as being a part of court procedure without violating due process. So I take it what you're complaining about is a violation of the contractual agreement entered into by the parties, presumably the AAA rules and whatever documentation you're required to execute. And you may well be right. It doesn't appear that there's anything that speaks very explicitly to that. But that still leaves me wondering, well, what exactly then is the objection to this procedure that is so well established and accepted in court? What's wrong with it in the context of arbitration? Well, Your Honor, I would maybe go a little bit beyond the contractual obligation issue because in a lot of cases where AAA is involved, that's the case. You know, the commercial rules, it's by contract where you're going to arbitration and you're agreeing to have it heard under those rules. Under this particular case, it goes beyond that, though, because the statute explicitly requires arbitration. But the statute doesn't specifically say that arbitration has to include an evidentiary hearing. No, but the rules that are published, you know, pursuant to that statute explicitly say that they are. Where does it say that? It's in section 24 of the rules. Quote, a hearing shall be opened. Stop right there. Hearing. It doesn't say evidentiary hearing. It says hearing. That's true. And there was a hearing in this case, a hearing oral argument on the summary judgment motion. This Court has dealt with lots of issues. Indeed, we don't even require an oral hearing to satisfy when there is a due process requirement for hearing. It can be satisfied by writings. So if that's what you have to point to to say that the rules require an evidentiary hearing, I've got to tell you, it doesn't sound like it to me. Well, Your Honor, I would agree with you if the section ended right there. But it continues. It describes what kind of hearing we're talking about. And it's very explicit. It says the complaining party shall then present its claim and proofs and its witnesses who shall submit to questions or other examination. What would you have put in if you had a hearing? Have you shown that in your brief? Certainly, Your Honor. Yeah, we referenced the fact that there's obviously a dispute about the free look provision at issue here. There were several documents that the plan itself published explicitly stating that this particular free look exemption was going to apply on an employer-by- employer basis. So are those questions that would have required witnesses and would have been subject to questions of demeanor and judgment as to credibility? I think certainly. So why isn't your argument, then, that summary judgment was inappropriate because there are material disputes of fact? We argued that as well on summary judgment, Your Honor. That would just be a straight-up challenge to summary judgment and then would compel you to get a hearing under anybody's rules. Agreed. And we didn't make those arguments to the arbitrator, but they were unfortunately rejected, I think because we didn't have a full evidence-sharing hearing. Let me give you another example, Your Honor. The fact that the settlement agreement at issue here, the arbitrator ruled that that settlement agreement was not ambiguous at all. And obviously the two parties looking at it have come to different conclusions on it. I think anyone looking at that language can say, okay, there's a pretty broad release here. That's going to apply to the full. Did you get a chance to argue that before the arbitrator? We argued that issue, certainly. Okay. Was there somebody else who knew about that settlement agreement that you would have called and put on the stand? Certainly, Your Honor. So you were going to rely on extrinsic evidence in the interpretation of the agreement? That's correct, Your Honor. And what would your witness have said? We would have called our witnesses who would have disclosed the fact that in negotiating this settlement agreement, Antioch Ford was the dealership that we're dealing with here. They explicitly told the plan that they were part of a control group. Ford Motor Company was a part of the release because a representative from Ford Motor Company was involved in the negotiations with the attorney. And so we certainly would have brought witnesses from both sides. Were those witnesses deposed? They were not, Your Honor. That was not allowed by the arbitrator. Okay. Were there declarations in the file from those witnesses? From our witnesses, Your Honor, but we didn't get a chance to examine the other side. That was the problem with this. But do you have declarations in the record saying that during the negotiations that Ford participated and it was disclosed that this was under common control? Yes, Your Honor. So you did get that evidence before the arbitrator? I did. Through a declaration. Our preference would have been to call Mr. Margrave instead of putting that in a declaration. But if you've put that into question, then it seems to me that the arbitrator would have to accept that. On the ordinary rules of summary judgment, the arbitrator would have to say, well, there's evidence here showing X. And if the point is controverted, then you have to go to a hearing. And that would just be ordinary rules of summary judgment. Well, we certainly made that argument, Your Honor. We would have preferred to call the — And if you made it to us. I mean, we get those arguments all the time. Summary judgment was inappropriate because there is genuine disputed material fact. And as I went through your brief, I really didn't see that argument. I heard the procedural complaint about the technique of summary judgment, but didn't see an argument that says if you're going to have summary judgment, it wasn't appropriate here. Have you made that argument to us? We did, Your Honor. We specifically made that with respect to the settlement agreement issue, where we said that, at the very least, this language was not clear on its face. We needed to rely on extrinsic evidence, and that would have required calling witnesses. And this Rule 24 specifically says that you not only call witnesses, but you get to cross-examine them. That would have been crucial in this case on a number of issues for us to be able to call the plans representatives, the ones that made these calculations, the ones that made these decisions, the ones that issued the trust agreement, which specifically defined employer in a different way than they're now maintaining. There were all kinds of issues. I would have loved to have cross-examined some of these folks on hearing, but we weren't allowed. You know, the arbitrator's decision on the Antioch-Ford settlement agreement was that the agreement was limited to Antioch-Ford and the trust bond. And that is, it wasn't designed to affect other dealerships that might have been under the common control of Ford. Now, that doesn't seem to exclude any evidence that you've offered. The district, the arbitrator just said, no, by reading this agreement, I can tell that this is what it means, and I'm not going to allow this. Implicitly, he said, I'm not going to allow this. So what's wrong with that? I mean, that just doesn't seem to violate the summary judgment rules. This feels like a new tack, counsel, that you did not raise squarely in your briefs. What's a new tack? Arguing that summary judgment was inappropriate. You've argued that the arbitrator didn't have authority, but the argument was framed to us as one that you cannot at any time, under any circumstances, use the technique of summary judgment in an arbitration. That's a very different argument from saying the way in which summary judgment was awarded here was inappropriate under the ordinary rules applying to summary judgment. Two different arguments. Very, very different arguments. I agree, Your Honor. We led with the procedural issue because I think it's so clear here from this section 24 and that that wasn't followed. But we made the other argument as well. I can point it out in our answering brief if we need to. We didn't spend a lot of time on it, but we certainly pointed out that at the very least, there was a question of fact here and it was inappropriate for the arbitrator to decide as a matter of law that it was clear on the paper exactly what this settlement agreement provided. And the problem with the arbitrator's ruling on this is that the assessment against Antioch-Ford was essentially double-charged later on because that history, that contribution base rate history was included in the calculation that we received later in 2010. So it was a part of it. And so the arbitrator blessed that by saying no, that that didn't apply and that the release didn't extend to that. Counsel, you're down to a minute and 45 seconds. Would you like to reserve that? I will. Thank you, Your Honor. Let me ask you when you come back for rebuttal, maybe you can help me by pointing toward where in the opening brief the argument was raised, the argument that Judge Bybee described. I may have missed it, but I confess I didn't see it. Thank you, Your Honor. Good morning. May it please the Court. My name is Matthew Minzer. I represent the automotive industry's pension plan. As you've heard this morning and read in the briefs, the appellants have raised four issues on appeal. The first issue relates to the arbitrator's use of summary judgment proceedings during the arbitration. In the briefing, appellants have somewhat conflated the distinction between the PBGC rules and the AAA MEPA rules. The PBGC rules specifically state that if an arbitration is conducted in accordance with the PBGC-approved procedure, the alternative procedure shall govern all aspects of the arbitration. Arbitration in this action was initiated pursuant to the MEPA rules, which are PBGC-approved. Therefore, they govern all aspects of the arbitration. Unless a section of the MEPA rules references the PBGC rules, we do not look to the PBGC rules for any purpose. Appellants have cited no authority stating otherwise. MEPA Rule 45 allows the arbitrator the sole power to interpret and apply the rules as they relate to the arbitrator's power and duties. MEPA Rule 24 allows the arbitrator to vary the conduct of the proceedings as long as the arbitrator affords the parties full and equal opportunity to plead their respective case. Were there issues of fact that needed to be resolved in a hearing? I would say there were not, Your Honor, because the arbitrator looked at that. The main issue that was raised was the Antioch Settlement Agreement and the party's intent to that. And the arbitrator looked at the agreement and said that there was no ambiguity in the agreement, so therefore there was no dispute of fact. Okay. Appellants focus on the fact that Rule 24 also discusses the procedure for the opening of a hearing. However, while Rule 24 explains the procedure for opening a hearing, it does not say that a hearing must occur in all matters before the arbitrator, nor does it disallow summary judgment. Nowhere do the rules disallow summary judgment. Appellants also focus on the fact that Rule 33 discusses the procedure for a waiver of the oral hearing and cites back to a specific section of the PBGC rules. We posit that this rule is describing a scenario most similar to a trial on the papers, where tribal issues of fact do exist and the parties consent to try such issues without live testimony. However, again, this section does not preclude the arbitration. The rules could be clearer, because doesn't Rule 33 suggest that the parties have to agree? Yeah. The parties made by written agreement waive oral hearings. Did the parties agree to waive oral hearings? They did not, Your Honor. Okay. Well, I mean, that, you know, we may think that the summary judgment is a terrific way of saving time, but the rules don't really say you can use summary judgment. It does say if the parties agree to waive oral hearings, then you can proceed to something else. But that's not the case. So Rule 33 just doesn't seem to be applicable to me. I understand, Your Honor. And what we posit is that the scenario described in Rule 33, like I said, is more like a trial on the papers, where there are issues of fact that are in dispute, but the parties agree to waive oral hearings. And that's similar to the other cases that we cited, where they use the AAA rules. When the arbitrator allowed a summary judgment motion, a full evidentiary hearing was not off the table by any means. After reviewing the moving papers, however, the arbitrator determined that there was no tribal issues of fact, and he should not award it in favor of the plan. Appellants admit in their reply that there are no cases on point in regard to handling this issue. However, they object to the cases cited by the plan, which discuss nearly identical language under the other AAA rules and court decisions affirming summary judgment. But we contend these cases must be regarded as persuasive in the absence of any other cases on point and given the broad authority given to the arbitrator by the MEPA rules. Finally, during the summary judgment proceeding, appellants were permitted to present their proofs by way of declarations, by way of briefs, and by way of oral argument, and they did. Appellants had ample opportunity to present evidence. The second issue raised by appellants relates to the arbitrator's application of the free look. Before you leave the first issue, I confess, back in my pre-judge day, I was involved in arbitration, and I don't think I've encountered a situation where a party said, even if an arbitrator proposed an alternative, a party said, look, I really want to present a live witness, and the arbitrator didn't entertain the live witness. Now, I don't know what's happening here, but was there ever any explanation offered as to why it was that the arbitrator declined to hear any witnesses? I think what the arbitrator did was say, I'm not going to take the evidence you're hearing off the table, but I'm willing to entertain a motion for summary judgment if anybody wants to bring one. And the plan brought one, and after the arbitrator reviewed it, he determined that there was no issue of fact that could change the outcome of the case. He looked at the Antioch Settlement Agreement was the main issue brought up by the appellants, and the arbitrator looked at that agreement and said, the agreement is very clear. There's no ambiguity, so no live witness is required to interpret the agreement. Is it your position currently that there is no ambiguity in that agreement? That's correct, Your Honor. There's only one interpretation that's possible? Yes. And the admission of testimony by other people who presumably would have testified they had a different understanding of what that language meant would not have had any impact? I don't think it would, Your Honor. Did the arbitrator give fair notice to the sides that it was considering summary judgment rather than having any kind of a hearing? I don't think I understand the question, Your Honor. Okay. Well, I just wondered if the arbitrator said, I don't think there's any factual problems here, and I may enter summary judgment. Did the arbitrator do that at all? I'm not sure about that, Your Honor, but I know that the arbitrator did entertain the motion for summary judgment without taking the evidentiary hearing off the table. It wasn't until . . . Was there just one hearing? One hearing, yes, Your Honor. One hearing. Okay. The second issue raised by appellants relates to the arbitrator's application of the free look. I'm not going to belabor what was set forth in the papers, but I do want to draw a few distinctions. As set forth in the papers, the free look does not apply unless an employer meets all conditions of the statute and the plan adopts the free look. And as set forth in ERISA 4001B1, all trades or businesses under common control are a single employer. Appellants' reliance on the Robbins case out of the Northern District of Illinois is misplaced. The exception in question in Robbins was for a suspension of contributions due to a labor dispute. In Robbins, the trust fund basically tried to argue that where a control group is present, the statutory exceptions to withdrawal liability are inapplicable. The Illinois court rejected this argument, saying that a control group employer must be treated like any other employer when applying the exceptions. The major distinction here is in the wording of the exception. The labor dispute exception applies when an employer suspends contributions during a labor dispute involving its employees. Employees of one control group member are employees of the entire single employer. Nothing in the wording of the exception disqualified the Pepsi group from utilizing the exception when applying the labor dispute exception on a control group basis. But here, with the free look exception, it was adopted by the plan to allow a maximum five-year free look for employees who first had to contribute after March 1st of 2005. The Ford control group clearly does not qualify under this criteria because group members were contributing before March 1st, 2005, and contributed for more than five years. Moreover, it cannot be ignored that five years later, in Hoosier Dairy, the same Illinois court that decided Robbins specifically stated that because one member of a control group was not eligible, the other members could not utilize the free look. Finally, appellants, in their reply brief, criticized the plan's citation of Penn Central. However, in deciding Penn Central, this court specifically held that in order to apply the withdrawal liability exception regarding a change in corporate structure, all members of the control group must qualify for the exception. In Penn Central, because the entire control group did not withdraw solely as the result of a stock sale of its last withdrawing member, it was not eligible for the exception. While not discussing the free look, Penn Central was the only Ninth Circuit case on point, and it directly supports the plan's position requiring that the entire control group qualify for the exception. JUSTICE SCALIA. I had a question about the attorney's fees. In this case, the arbitrator granted attorney's fees under the criteria, but the district court denied it. Are those incompatible? MR. GOLDBERG. I don't think they are, Your Honor. The arbitrator had a different standard when he was looking at the fees. The arbitrator was relying on MEPA Rule 38, which allows him to award fees, and 29 U.S.C. 1401, and they can award reasonable fees. But when Judge Teicher was looking at it, Judge Teicher was looking at it under, I believe, 1458, and he analyzed the Hummel factors and decided that the plan did not warrant fees for the district court action, but he upheld the fees that the arbitrator had granted. JUSTICE SCALIA. Did the district court find that the dealers were not in bad faith or engaged in deletory activities like the arbitrator did, or is the criteria slightly  MR. GOLDBERG. The criteria was slightly different, Your Honor. Before the district court, the action was extremely limited. It was that the parties, both the plan and the appellants, filed to either confirm or set aside the arbitration award. No discovery was conducted. It went almost straight to summary judgment motions. So there wasn't very much activity that occurred during the district court case for the judge to make a finding of fees on versus the arbitration, which lasted about five years. The third issue raised by the appellants is the 2007 Antioch Settlement Agreement. The plan's position on this issue is clear. The release in the Antioch Settlement Agreement is expressly limited to claims predating or existing at the time of the release arising out of the dispute. The language is unambiguous, as found by both the arbitrator and by Judge Teicher. It does not release claims for future withdrawal liability. It relates only to the assessment in 2005 of Antioch for a complete withdrawal, and release of Antioch and others is limited to that same dispute. JUSTICE KENNEDY. Let me ask you about the Antioch, because I confess I may not — it's possible I haven't really understood the argument being made. Did the — is the argument, as you understand it, being made that the inclusion of Antioch improperly, from the perspective of defendants, improperly shifted the time period or started the free-look time period, and the clock should have been reset, taking Antioch forward off the table completely? As distinguished from — and this is the one I'm struggling with — did the calculation of the withdrawal liability, the number, was that affected by the inclusion of Antioch forward? MR. LIEBERMAN. If I could take your second point first, what the plan did was they took the contribution-based units, the hours, and they included them in the later assessment. They included the Antioch hours. Then they deducted as a straight deduction the payment made by Antioch, so it came right off the top. So they were credited. It wasn't double-charging, as was alleged by appellants. CHIEF JUSTICE ROBERTS. Now, they — was there any adverse effect to the dealership group as a result of the calculation that included the Antioch forward hours? MR. LIEBERMAN. I couldn't tell you if the dollar amount, what the difference would have been, or if there was a difference, but we gave them the most favorable credit possible when including them in the control group. My understanding of their argument, why they believed that the Antioch settlement agreement held something different, was that they believed it completely absolved Antioch from any future withdrawal liability claims whatsoever, rather than relating to the 2005 assessment of Antioch that the plan had done. CHIEF JUSTICE ROBERTS. Well, the agreement does appear to have been aimed at attaining complete peace for Antioch forward, which I understood was closing its doors. And so if there is an adverse effect on the dealership group by including hours for a settlement that had been achieved and was presumably aimed at obtaining complete peace, why isn't that inconsistent? MR. LIEBERMAN. I don't think it is, because the Antioch settlement agreement specifically referred to the dispute. The dispute is that 2005 assessment. And we didn't know at the time that the Antioch proceedings were going on that Antioch was part of a greater control group with Ford. That didn't come out later until 2009. And so looking back at it, they were now included in the control group, but they were given the most favorable treatment possible. CHIEF JUSTICE ROBERTS. Well, you say it's the most favorable treatment possible, but if, in fact, you can't tell me that they would have been better off if Antioch Ford disappeared, better off in a calculation sense, not the starting of the first free look period, then I'm not sure it's the best possible result. MR. LIEBERMAN. I should clarify my statement. The best possible result, when including them in the control group, there was another way to calculate their inclusion and their amortization of their payment, which would have been less favorable to them. The plan gave them the most favorable treatment possible. CHIEF JUSTICE ROBERTS. Except for the possibility that, I mean, indeed, as I think back, didn't the Antioch Ford settlement agreement make reference to other parties, maybe even made specific reference to Ford? MR. LIEBERMAN. It did. CHIEF JUSTICE ROBERTS. So how could it be unknown to anybody that there was a relationship such that they could have been later deemed part of the same control group? Otherwise, there would never have been a reference to Ford, would there?  LIEBERMAN. I can't speak to that specific fact. CHIEF JUSTICE ROBERTS. Well, let me just say, if in fact they got a settlement agreement, but it worked out that the numbers they were assessed later included some of those hours that had already been worked and were history by 2005 or whatever the year it was, why isn't there some merit to the argument that the assessment is reaching back to extract more money from the group that included Antioch Ford for things that it had already achieved a settlement agreement and should have gotten complete peace? MR. LIEBERMAN. Again, my argument is to the terms of the agreement which define the dispute as that 2005 complete withdrawal. This I would define as an entirely separate event. And I do want to, unfortunately I'm out of time, but I thank you. CHIEF JUSTICE ROBERTS. Okay. Thank you, counsel. MR. LIEBERMAN. Just to circle back on that argument that you may have missed in our papers. In our opening brief, we made that argument at page 35, and then in our answering brief at page 14, and again that was just the argument that even putting aside the specific rules that govern, in this case, summary judgment was inappropriate here because the language itself was not, the language was ambiguous and thus it shouldn't have been adjudicated  CHIEF JUSTICE ROBERTS. Did you use the words material disputes of fact in your brief? MR. LIEBERMAN. Something similar to it, Your Honor. It said if the agreement is ambiguous and the interpretation of the agreement is an issue of fact, and we cite some case law just citing the usual summary judgment rule, and it says if the interpretation was an issue of fact, it was inappropriate for the arbitrator to grant summary judgment and error for the district court to confirm  CHIEF JUSTICE ROBERTS. Well, you can judge facts on papers. That doesn't go to the question of demeanor of witnesses. So the question of whether live testimony would have altered this and whether you had to, whether credibility determinations were at issue, that doesn't really go to that. MR. LIEBERMAN. I just saw counsel fail to be able to explain exactly what the language in the agreement said. And so our position is that the language itself is ambiguous. It raises all these questions that were raised by the panel about if Antioch Ford wanted to buy peace, then how would it do that? And that's clearly what it meant to do. It's hard to imagine broader language. You know, I would challenge the plan to cite language that could have been cited in the settlement agreement to actually buy complete peace and not have that then counted against this control group five years later under a much higher withdrawal liability amount, because we have to keep that in mind. I mean, counsel referred this as to a favorable outcome, but it certainly wasn't, because what the plan did was it calculated the contribution base units for all the dealerships, including Antioch Ford, which thought it had bought peace back in 2005, but then calculated it the much higher withdrawal liability rate in 2010. And so the difference in the underlying assessment is substantial. You know, $1 million, $1.5 million. It's a material issue, and that's why, obviously, it was a key issue of arbitration and one that deserved an evidentiary hearing. We wanted to call these folks who negotiated this settlement agreement and said, what were you intending to do here? Why did you refer to the control group? Why did you so broadly define the dispute in this case? Why did you include Ford Motor Company and some of Ford Motor Company's employees in the release? And our position is if we would have been able to present that at a full evidentiary hearing, we would have been able to show the arbitrator that the whole point of this exercise was for Antioch Ford to buy peace. If it didn't want to buy peace or didn't want to have a full release, it could have just paid the assessment. Under these circumstances, a settlement agreement is not necessary. It's only if you want to do something in addition. Because if you agree, because in that situation. So your argument, I think you've made two arguments with respect to the settlement agreement. One is the settlement agreement covered everybody else within the control group. Is that correct? And, therefore, it released the claims against the other Ford companies because they were all within the common control of Ford. No, Your Honor, no, because that was a later assessment or a later withdrawal from those entities. So that wouldn't have been a particular dispute at the time. The only issue that we have with the application of the Antioch settlement agreement is the fact that Antioch was not, was counted again later. So it's a double-counting problem. Exactly. Okay. Which has a monetary effect. As I indicated before, I had understood the argument to have more to do with when the first look period starts. But it's, I take it you're confirming what I was stumbling about with your colleague. Is there an adverse monetary effect on your clients as a result of including the Antioch Ford hours and doing the arithmetic calculation that leads to the withdrawal liability? Absolutely, Your Honor. Do you know what that is? I don't know the exact number. We did have an actuary calculate this at one point. I want to say it's a million dollars, a million two, something like that, but almost halving the assessment itself by including that count in there. But, yeah, it was substantial, Your Honor. If we thought there was a double-counting problem, what's the remedy? Well, Your Honor, I think that the remedy for this entire situation is the case you go back to arbitration and have an evidentiary hearing as required by the statute. Have you ever listed the witnesses that you would put on in their hearing? Is that in your brief or in the record? I'm not sure if we mention them in our brief. They're certainly in the record. Joe Margraf was the Ford representative who negotiated the Antioch Ford settlement back in 2005. So he negotiated with that with the Plans Council. So we weren't able to present him as a live witness, so we presented a declaration from him. But certainly he would have been our key witness at the evidentiary hearing.  Thank you, counsel. Thank you. We thank both counsel for the argument. The Automobile Industry Pension Fund versus South City Motors is submitted.
judges: Siler, Clifton, Bybee